**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
)
WHITNEY WARD,                                    )
)
          Plaintiff,           )
)
    v.                                       )    Civil Action No. 24-2806 (RBW)
)
DISTRICT OF COLUMBIA,                        )
)
          Defendant.           )
)
—————————————————————

## **MEMORANDUM OPINION**

The plaintiff, Whitney Ward, brings this civil action against the defendant, the District of

Columbia, alleging that the District of Columbia Fire and Emergency Medical Services

("DCFEMS") violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e,

and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1402.11, by: (1)

engaging in race- and gender-based discrimination, see First Amended Complaint

("Am. Compl.") ¶¶ 124–38, 154–70, ECF No. 11; (2) creating a hostile work environment based

on her gender, see id. ¶¶ 139–53; and (3) retaliating against her for engaging in protected

activity, see id. ¶¶ 171–84.  Currently pending before the Court is the Defendant's Motion to

Dismiss ("Def.'s Mot."), ECF No. 13, pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6).  Upon

careful consideration of the parties' submissions,[1] the Court concludes for the following reasons

that it must grant in part and deny in part the defendant's motion to dismiss.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) the Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"),
ECF No. 16; and (2) the Reply in Support of Defendant District of Columbia Motion to Dismiss ("Def.'s Reply"),
ECF No. 17.

# I.    BACKGROUND

## A.    Factual Background

The following allegations are derived from the plaintiff's Complaint unless otherwise specified.

### 1.    The Plaintiff's Initial Interaction with Mr. Ford in 2013

The plaintiff is an "African American female[,]" who "has been employed with DCFEMS since 2006[,]" Am. Compl. ¶ 1, originally in the capacity as a Firefighter Emergency Medical Technician, see id. ¶ 9.  "In September [ ] 2013, [the p]laintiff joined the Fire Investigations Division[,]" and was "promoted to a Fire Investigator" in December 2013, the role in which she was serving when she filed her Complaint.  Id. ¶ 10.  In this position, the plaintiff "works a 24-hour shift and is assigned to a particular shift or platoon number[,]" id. ¶ 12, and she "was assigned to the third platoon[,]" id. ¶ 13. However, the plaintiff could earn overtime "by working a shift in another platoon between her scheduled shifts."  Id.  "For the majority of her tenure in the third platoon, [the p]laintiff was the only African American woman working on her shift."  Id. ¶ 14.

Early in her tenure as a Fire Investigator, the "[p]laintiff worked a shift with then firefighter Scott Ford, a white male DCFEMS Fire Investigator, who [was] scheduled on the first platoon."  Id. ¶ 15.  The plaintiff represents that because she and Mr. Ford were not in the same platoon, they ended up working together "likely because one of them had either traded a shift or was working overtime."  Id. ¶ 16.  According to the plaintiff, "[u]pon seeing [the p]laintiff," Mr. Ford stated to her, "'I'm not here to fuck you or fuck you over like these other men,' or words to that effect."  Id. ¶ 17.  The plaintiff further represents that Mr. Ford "then followed up by stating, '[Y]ou're a black woman on this job and people are scared of y'all,' or words to that effect."  Id. ¶ 18.  The "[p]laintiff believes that this was their very first interaction[,]" id. ¶ 20, and she

represents that although she "was taken aback and was offended by [Mr.] Ford's comment[,]" id. ¶ 19, she "did not respond" and "attempted to brush it off, taking into consideration that she and [Mr.] Ford did not work the same shift and that any interactions would be minimal[,]" id. ¶ 21. The plaintiff represents that Mr. Ford "made the exact same statement to other African American women DCFEMS employees[ . . .] during his first interaction with them."[2] Id. ¶ 23.  And, the plaintiff represents that she was subsequently "warned" by other female firefighters "that Sgt. Ford's pattern was to initially be friendly to Black female firefighters, but then to target them for attention, and to try to engage in sexualized banter with [them]."  Id. ¶ 34.  However, the plaintiff does not allege that she had any further interaction with Mr. Ford between 2013 and 2020.

## 2. Mr. Ford's Promotion to Sergeant and His Alleged Harassment of the Plaintiff between 2022 and 2023

"In approximately 2020, [Mr.] Ford became a K-9 handler, and began working the same shift as [the p]laintiff in the third platoon."  Id. ¶ 30.  And, "[i]n approximately 2022, [Mr.] Ford was promoted to Sergeant" and "became [the p]laintiff's immediate supervisor, which meant [that the p]laintiff was required to interact, engage, and collaborate with Sgt. Ford on a frequent basis to carry out her duties."[3]  Id. ¶ 31.

The plaintiff represents that, upon his promotion to Sergeant, which gave him supervisory authority over the plaintiff, Sgt. Ford engaged in inappropriate interactions with her.  The

[2] The plaintiff "references and incorporates the factual allegations outlined in, . . . Sanders, et al. v. District of Columbia, pending in [this Court] as if fully restated herein."  Am. Compl. ¶ 23 (citing No. 22-cv-2259 (BAH)). However, "[t]he Court does not consider allegations from other complaints that are incorporated merely by reference[,]" therefore only the allegations in the plaintiff's amended complaint are considered.  Thomas v. District of Columbia, No. 23-cv-01378 (AHA), 2025 WL 1279362, at *11 n.2 (D.D.C. May 2, 2025) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1326 (4th ed. 2008) ("Although [Federal Rule of Civil Procedure] 10(c) is not expressly limited to pleadings in the same action, it has been held that allegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference." (collecting cases)).

[3] The plaintiff's Complaint references Mr. Ford as Sgt. Ford upon his promotion, and thus, the Court does too for the sake of consistency.

plaintiff represents that, at some points during 2022 and 2023, Sgt. Ford asked the plaintiff if she "was single or dating anyone, and . . . about her relationship with the father of [her] child," id. ¶ 37, and that he told the plaintiff that "she was sexy or really attractive[,]" id. ¶ 38, and that her clothes "showed off her figure," id. ¶ 39.  The plaintiff alleges that Sgt. Ford's "inappropriate and overly sexual conduct" continued "over the course of years," id. ¶ 47, and that "Sgt. Ford's comments were accompanied by lewd and suggestive non-verbal traits, such as tone of voice and facial expressions" that the plaintiff represents "made clear that his comments were of a flirtatious or solicitous nature, which made [her] extremely uncomfortable[,]" id. ¶ 42.  The plaintiff states that she was the only woman on her shift and "[Sgt.] Ford's repeated objectification and sexualization" made her "go [through] extra lengths and efforts to be taken seriously by her male colleagues." Id. ¶ 40.  The plaintiff further states that although some of her male colleagues sought to intervene, "Sgt. Ford would brush [these] colleagues off, saying that he didn't mean anything by it, or that it wasn't a big deal, or words to that effect." Id. ¶ 46.

Despite objections by the plaintiff and several of her colleagues, the plaintiff represents that Sgt. Ford's behavior continued.  According to the plaintiff, "[o]n one occasion in late 2022 or early 2023, Sgt. Ford texted [the p]laintiff seeking her opinion about an incident in which an individual was caught masturbating during a home invasion." Id. ¶ 50.  And, on another occasion in April 2023, "while [she] was attempting to leave the fire station, Sgt. Ford physically blocked [her progression] while she was trying to exit the doorway[,]" and while he was blocking her path, Sgt. Ford "asked her if she 'had to make alterations or buy bigger clothes' to accommodate [her] breasts, . . . while staring down at [her] chest." Id. ¶ 53.  Then, during a shift change on or about June 21, 2023, while the plaintiff was speaking with a friend and colleague about a new tattoo on her leg, see id. ¶ 58, Sgt. Ford approached the plaintiff "in an aggressive

4

manner and stated, 'Is that flavored ink they used? What flavor is that?'", id. ¶ 59, with "an expression on his face like he was salivating or hungry to taste something[,]" id. ¶ 60. Another colleague intervened, telling Sgt. Ford that he "better back up and leave her alone[.]" Id. ¶ 61. The plaintiff reported Sgt. Ford to Capt. Brian Phillips, see id. ¶ 64, who "called Sgt. Ford into his office and told [him] that his conduct was unacceptable, especially given that Sgt. Ford was ostensibly an [Equal Employment Opportunity ('EEO')] counselor for the department[,]" id. ¶ 65.

However, according to the plaintiff, no other action was taken against Sgt. Ford, see id. ¶ 66, and she represents that Capt. Phillips' reprimand had no effect on Sgt. Ford's conduct. Specifically, the plaintiff represents that on or about July 10, 2023, she "was laying down in the bunkroom[ alone,]" id. ¶¶ 67, 71, which is a shared rest space in the fire station, see id. ¶ 68, when, "[a]t one point during the middle of the night, Sgt. Ford entered the bunkroom, repeatedly call[ing] [the p]laintiff's name to wake her up and then asked [the p]laintiff if he could turn on a light to retrieve an item[,]" id. ¶ 70.

Sgt. Ford then left the bunkroom but reentered in what "seemed like minutes later," id. ¶ 72, calling her name, causing the plaintiff to again wake with "Sgt. Ford towering over her at the foot of her bunk," id. The plaintiff represents that her "bunk was secluded in the back of the bunkroom and during this time she was the only person in the bunkroom." Id. ¶ 69. According to the plaintiff, Sgt. Ford "asked if he and [the p]laintiff could have a conversation," id. ¶ 73, which she declined, but Sgt. Ford "insisted again" that they have a conversation, id. ¶ 74, which the plaintiff again declined, id. Nonetheless, the plaintiff alleges that Sgt. Ford approached her bunk and "began speaking about how he noticed that [the p]laintiff had not been giving him

enough attention." Id. ¶ 76. Sgt. Ford then left the bunkroom when he heard other members of the fire department ascending the stairs to where the bunkroom was located. See id. ¶ 83.

Then, on August 3, 2023, Sgt. Ford looked at the plaintiff's laptop while she was "completing her school assignments", id. ¶¶ 87–88, and, after reading the discussion amongst the plaintiff's classmates, Sgt. Ford said "it seems like they're having a dick measuring contest," id. ¶¶ 88–89.

The plaintiff alleges that she had "difficulty focusing on her tasks and carrying out her duties[,]" id. ¶ 95, because of Sgt. Ford's conduct, and had to change her "movements at the fire station to avoid Sgt. Ford, and particularly to avoid being alone with him[,]" id. ¶ 96.

### 3. The Plaintiff's EEO Contact and Subsequent Transfer

In response to Sgt. Ford's conduct, the plaintiff contacted an EEO counselor on July 31, 2023, id. ¶ 86, who instructed her to submit a special report, which she did on August 4, 2023, id. ¶ 99. In the report, the plaintiff "detail[ed] Sgt. Ford's sexual harassment and creation of a hostile work environment[,]" id., and "requested that Sgt. Ford be transferred from the third platoon[,]" id.

"Shortly after" submitting this report, the plaintiff alleges that "DCFEMS undertook a scheme to transfer [her.]" Id. ¶ 100. However, "[s]everal months later, Sgt. Ford was transferred out of the Fire Investigations Division and into the Operations Division[,]" id. ¶ 115, but he was "not demoted or sent to a trial board[,]" id. The plaintiff was promoted to Sergeant in October 2024, "[b]ased on her strong test scores." Id. ¶ 120. "However, rather than being allowed to remain in the Fire Investigations unit, [the p]laintiff was involuntarily transferred to the Operations Division, Engine 15[.]" Id. ¶ 120. The plaintiff alleges that the "male firefighters in her unit who earned promotion[s] were allowed to remain in the Fire Investigations unit after they were promoted to Sergeant." Id. ¶ 121.

In response to what had occurred, the plaintiff filed an EEO complaint on January 8, 2024, alleging "claims of race discrimination, sex discrimination, and retaliation." Id. ¶ 6. The Equal Employment Opportunity Commission ("EEOC") issued the plaintiff a notice of her right to sue on July 11, 2024. See id. ¶ 7.

**B.    Procedural Background**

On October 2, 2024, the plaintiff filed her original Complaint in this case, alleging that she was "subjected to racial and gender discrimination by way of harassment and a hostile work environment created by" Sgt. Ford, Complaint at 1, ECF No. 1, "as well as retaliation by DCFEMS for engaging in protected activity[,]" id. Then, on January 8, 2025, the Court granted the plaintiff's unopposed motion to amend her Complaint, and accepted her proposed Amended Complaint as filed. See Minute Order (Jan. 8, 2025); see generally Am. Compl. The defendant filed its motion to dismiss the plaintiff's Amended Complaint on January 22, 2025. See Def.'s Mot. at 1. On February 14, 2025, the plaintiff filed her opposition to the defendant's motion to dismiss, see Pl.'s Opp'n at 1, and on February 28, 2025, the defendant filed its reply in support of its motion to dismiss, see Def.'s Reply at 1.

**II.    STANDARD OF REVIEW**

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. Finally, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

The defendant argues that the plaintiff's Complaint fails to state a claim and must be dismissed pursuant to Rule 12(b)(6) because she (1) "failed to exhaust her administrative remedies about some of the alleged misconduct[;]" (2) "does not identify an adequate adverse personnel action to support her disparate treatment claims[;]" (3) has not alleged behavior that is "severe or pervasive enough to create a hostile work environment[;]" and (4) "fail[s] to identify a materially adverse action to support her claim for retaliation." Def.'s Mot. at 1.

In response, the plaintiff argues that she (1) properly exhausted her administrative remedies as part of a substantive hostile work environment claim and a retaliatory hostile work

environment claim, see Pl.'s Opp'n at 10; and (2) has otherwise adequately pleaded her disparate

treatment, hostile work environment, and retaliation claims under both Title VII and the

DCHRA, see id. at 6.  The Court will address these arguments in turn.[4]

A.    **Whether the Plaintiff Has Stated Claims of Race and Gender-Based Disparate**

**Treatment Under Title VII and the DCHRA (Counts I, II, V, and VI)**

The defendant argues that the plaintiff's disparate treatment claims must be dismissed for

failure to state a claim because she failed to exhaust the discrete acts alleged in the Complaint,

see Def.'s Mem. at 2, or failed to allege an adverse employment action, see id.  The plaintiff

responds that her claims are "not dependent on a specific adverse action, but rather [are] the

culmination of many actions that amount to disparate terms and conditions of employment[,]"

and that sexual harassment itself became the terms and conditions of her employment.  Pl.'s

Opp'n at 6.  In reply, the defendant argues, inter alia, that the plaintiff's disparate treatment

claims "are merely hostile work environment claims in disguise."  Def.'s Reply at 8.

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment

practice for an employer to . . . discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff alleging

discrimination under Title VII must therefore show that "(i) [she] suffered an adverse

employment action (ii) because of [her] race, color, religion, sex, [or] national origin[.]"  Baloch

v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citing 42 U.S.C. § 2000e-16(a)).  "Title

---

[4] Although the defendant argues that the plaintiff failed to exhaust her administrative remedies regarding the component of her claims relating to her transfer to another unit, the plaintiff disclaims reliance on that transfer as a standalone adverse action, see Pl.'s Opp'n at 10, and, as the Court concludes below, her retaliatory hostile work environment claim fails even assuming arguendo that she did exhaust her administrative remedies as to this component of her claim, see infra Sec. III.C.  Therefore, the Court does not address this argument.

VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577 (2009). "In addressing employment discrimination claims under [the DCHRA], courts look to the jurisprudence surrounding Title VII." Burt v. Nat'l Republican Club of Capitol Hill, 828 F. Supp. 2d 115, 122 (D.D.C. 2011), aff'd, 509 F. App'x 1 (D.C. Cir. 2013).

To establish an "adverse employment action" for the purposes of a Title VII discrimination claim, the plaintiff must show "some harm respecting an identifiable term or condition of employment." Muldrow v. City of St. Louis, 601 U.S. 346, 347 (2024). The phrase "terms, conditions, or privileges of employment" is intentionally broad because it "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).

Separate and apart from bringing a discrimination claim, a plaintiff may also pursue a hostile work environment claim if she can adequately allege that her "workplace [ ] is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" Ellis v. Noem, No. 24-cv-977 (EGS), 2025 WL 2732733, at *7 (D.D.C. Sept. 25, 2025) (quoting Vinson, 477 U.S. at 64).

However, it is well-established that "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim[,]" Franklin v. Potter, 600 F. Supp. 2d 38, 77 (D.D.C. 2009), and therefore, "[t]o preserve the distinction between discrete disparate treatment claims and hostile work environment claims, courts have

often cautioned that '[u]se of the same discrete acts, upon which [a] plaintiff bases [her] discrimination and retaliation claims, to support a hostile work environment claim is disfavored[,]'" Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 60 (D.D.C. 2022) (quoting Townsend v. United States, 236 F. Supp. 3d 280, 312 (D.D.C. 2017)).

Here, although Counts I, II, V, and VI are labeled as gender or race-based discrimination claims, these counts use language that is identical to the plaintiff's hostile work environment claims, which focuses on the severity and pervasiveness of Sgt. Ford's comments and actions. Compare Am. Compl. ¶ 130 (arguing in the context of disparate treatment that Sgt. Ford's conduct was "so severe and pervasive such that it altered the conditions of [the p]laintiff's employment"); id. ¶ 160 (same), with id. ¶ 144 (using same language for her hostile work environment claim). Indeed, Counts I, II, V, and VI expressly indicate that the "[p]laintiff was substantially harmed by the harassment and hostile work environment" for which she seeks relief. Id. ¶¶ 138, 170.

The plaintiff further disavows any attempt to raise her involuntary transfer as a discrete adverse employment action, see Pl.'s Opp'n at 10, nor does she argue that any of the other alleged conduct in her Amended Complaint constitute adverse employment actions, see generally id. Instead, the plaintiff argues that "[r]egardless of whether or not [she] suffered adverse employment actions, the fact that she suffered sexual harassment because DCFEMS did not care to prevent it, is actionable, in and of itself[,]" id. at 14.

In support of her position that a course of conduct of sexual harassment can itself constitute an adverse employment action for the purposes of a discrimination claim, the plaintiff relies on the District of Columbia Circuit's decision in Bundy v. Jackson, 641 F.2d 934 (D.C. Cir. 1981). In Bundy, the D.C. Circuit concluded that the plaintiff had established disparate

treatment because sexual harassment was her employer's "standard operating procedure," which made the "employee's endurance of sexual intimidation a 'condition' of her employment." 641 F.2d at 946. However, the plaintiff's reliance on <u>Bundy</u> is misplaced because that decision pre-dated the Supreme Court's recognition of hostile work environment claims pursuant to Title VII. <u>See</u> <u>Vinson</u>, 477 U.S. at 66. Although sexual harassment can constitute an adverse employment action, it is discrete acts of sexual harassment that affect the terms or conditions of employment that constitute disparate treatment. <u>See, e.g.</u>, <u>Kirkland v. McAleenan</u>, No. 13-cv-194 (RDM), 2019 WL 7067046, at *23 (D.D.C. Dec. 23, 2019) ("In the disparate treatment context, an adverse action is one that affects . . . employment or future employment opportunities in an objectively tangible way.").[5] Merely reframing a hostile work environment claim as a disparate treatment claim, without alleging that any discrete acts of discrimination rise to the level of an adverse employment action, is woefully insufficient and "significantly blur[s] the distinction between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address." <u>Hampton v. Vilsack</u>, 760 F. Supp. 2d 38, 57 (D.D.C. 2011) (quoting <u>Rattigan v. Gonzales</u>, 503 F. Supp. 2d 56, 82 (D.D.C. 2007)). Thus, because the plaintiff has failed to allege any discrete adverse employment action in support of her disparate treatment claims, the Court must dismiss Counts I, II, V, and VI for failure to state a claim.

---

[5] In her opposition, the plaintiff appears to argue that the defendant "has created a racially disparate working environment by systematically ignoring the complaints of African American women because of their race." Pl.'s Opp'n at 27. However, "an agency's 'alleged failure to investigate' a complaint submitted by [the] plaintiff regarding the conduct of another employee 'does not make up a tangible, affirmative legally cognizable adverse action'" for the purposes of a discrimination claim. <u>Akosile v. Armed Forces Retirement Home</u>, 141 F. Supp. 3d 75, 93 (D.D.C. 2015) (quoting <u>Runkle v. Gonzales</u>, 391 F. Supp. 2d 210, 223 (D.D.C. 2005)).

**B.**      **Whether the Plaintiff Has Stated a Claim for a Hostile Work Environment Under Title VII and the DCHRA**

The defendant argues that the plaintiff's hostile work environment claim does "not rise to the level of severity necessary to state a hostile work environment claim[,]" Def.'s Mem. at 17, as her allegations are "conclusory and lack concrete information[,]" id. at 18, "scattered across an extended period of close contact[,]" id. at 19, and "only amount to a handful of discrete acts that were not so severe and pervasive as to alter her working conditions[,]" id.  The plaintiff responds that she "outlines a pattern of behavior . . . that was outrageous, and completely out of bounds of acceptable behavior[,]" Pl.'s Opp'n at 18, and was therefore "sufficiently severe and pervasive to interfere with her ability to execute her duties[,]" id. at 16.

As an initial matter, the Court concludes that the plaintiff has not actually pleaded a hostile work environment claim based on her race.  See Am. Compl. at 19–20 (characterizing Counts III and IV as based on gender alone).  Although the plaintiff appears to claim in her opposition that she has "functionally" alleged a "race plus" or "gender plus race" claim, Pl.'s Opp'n at 26, she has not in fact pleaded a claim of this nature in her Amended Complaint, see Am. Compl. at 17, 19, 23 (characterizing Counts I, II, III, IV, VII, and VIII as based on gender alone); id. at 21 (characterizing Counts V and VI as based on race alone).  Thus, because "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss[,]" McManus v. District of Columbia, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007) (citation and quotation omitted), the Court will not address her "race plus" or "gender plus race" theories of liability.  Thus, the Court will turn to the plaintiff's hostile work environment claims based on her gender.

13

As indicated above, Title VII prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." Harris, 510 U.S. at 21. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)). "To prevail on [a hostile work environment] claim, a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21). "Courts look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23). A claim with "several individual acts" may "become actionable due to their 'cumulative effect,'" if they are "'adequately linked' such that they form 'a coherent hostile environment claim.'" Baird v. Gotbaum, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). Courts consider the frequency of individual acts and whether they involve the same managers and the same kind of employment action to determine whether individual acts are adequately linked. Shanks v. Int'l Union of Bricklayers & Allied Craftworkers, 134 F.4th 585, 597–98 (D.C. Cir. 2025).

However, Title VII is not a "general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). Thus, "[c]ourts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile

behavior and the plaintiff's membership in a protected class." <u>Na'im v. Clinton</u>, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (collecting cases); <u>see</u> <u>Kelley v. Billington</u>, 370 F. Supp. 2d 151, 157 (D.D.C. 2005) ("Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.").

The DCHRA also prohibits employers from "engag[ing] in harassment based on one or more protected characteristics[,]" which includes race and gender.  D.C. Code §§ 2-1402.11(a), (c-2)(1).  The DCHRA defines harassment as conduct that "unreasonably alters an individual's terms, conditions, or privileges of employment[.]"  <u>Id.</u> § (c-2)(2)(A).  Although courts previously analyzed hostile work environment claims brought pursuant to the DCHRA using the same standards as Title VII, the DCHRA was amended in 2022 to clarify that "[c]onduct need not be severe or pervasive to constitute harassment and no specific number of incidents or specific level of egregiousness is required."  D.C. Code § 2-1402.11 (c-2)(3).  The DCHRA now directs that courts should consider the following factors, with no one factor being determinative:

> (A) The frequency of the conduct;
> (B) The duration of the conduct;
> (C) The location where the conduct occurred;
> (D) Whether the conduct involved threats, slurs, epithets, stereotypes, or humiliating or degrading conduct; and
> (E) Whether any party to the conduct held a position of formal authority over or informal power relative to another party.

<u>Id.</u>

"Although a plaintiff need not plead a prima facie case of hostile work environment in the complaint, the 'alleged facts must support such a claim.'"  <u>McKeithan v. Boarman</u>, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (quoting <u>Middlebrooks v. Godwin Corp.</u>, 722 F. Supp. 2d 82, 90–91 & n.6 (D.D.C. 2010)).

With this legal framework as its guide, the Court will first address whether the plaintiff has adequately alleged that the discriminatory conduct in this case was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[,]" Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21), as is required to sustain a Title VII claim. The Court will then determine whether the plaintiff has adequately alleged a hostile work environment claim under the DCHRA.

**1.    Whether the Plaintiff Has Adequately Alleged Severe or Pervasive Gender-Based Harassment**

As indicated above, to state a hostile work environment claim under Title VII, "a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21). To determine whether a plaintiff has met her burden of alleging facts that support her hostile work environment claim, see McKeithan, 803 F. Supp. 2d at 69 (quoting Middlebrooks, 722 F. Supp. 2d at 90–91 & n.6), the Court must assess the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance[,]" Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23).

For the following reasons, the Court concludes that at this early stage of the case and the applicable standard of review, the plaintiff has alleged sufficient facts to support her hostile work environment claim. First, as a female, she is a member of a protected class. Second, she alleges that she was subjected to unwelcome sexual harassment on numerous occasions by Sgt. Ford. And third, it is reasonable to infer that the alleged harassment was based upon the plaintiff's sex

because Sgt. Ford is male and the content of several of his alleged statements towards the plaintiff explicitly reference her being a female and were sexual in nature.  See Akonji v. Unity Healthcare, Inc., 517 F. Supp. 2d 83, 97 (D.D.C. 2007) ("The alleged sexual harassment was committed by Nwokorie, a man, against Akonji, a woman, thus allowing the Court to infer that the third element of a prima facie case is satisfied.").

The Court also concludes that, at this stage of the litigation, the plaintiff has adequately alleged that her work environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment[.]"  Harris, 510 U.S. at 21 (internal quotations and citation omitted).  In support of her hostile work environment claim, the plaintiff alleges five specific comments over the course of roughly one year: (1) Sgt. Ford's text message "in late 2022 or early 2023" in which he sought "her opinion about an incident in which an individual was caught masturbating during a home invasion[,]" Am. Compl. ¶ 50; (2) Sgt. Ford's comments, while blocking the plaintiff's movement, regarding whether she "'had to make alterations or buy bigger clothes' to accommodate [her] breasts, . . . while staring down at [the plaintiff's] chest[,]" id. ¶ 53; (3) Sgt. Ford's question to the plaintiff about what flavor ink was used for her leg tattoo, see id. ¶¶ 58–60; (4) Sgt. Ford waking the plaintiff up several times while she was alone in the bunkroom in the middle of the night because the plaintiff "had not been giving him enough attention[,]" id. ¶¶ 68–76; and (5) Sgt. Ford's comment to the plaintiff that it appeared that her classmates were "having a dick measuring contest[,]" id. ¶ 89.

The Amended Complaint clearly indicates that these events were far from the only alleged instances of harassment by Sgt. Ford.  The Amended Complaint also alleges that Sgt. Ford "frequently made comments or gestures toward [her], such as intrusively inquiring about

her personal life and commenting on her appearance, which made [her] uncomfortable and offended her." Id. ¶ 36 (emphasis added).  These "frequent" comments allegedly included "ask[ing] whether [the p]laintiff was single or dating anyone, . . . ask[ing] her about her relationship with the father of [her] child[,]" id. ¶ 37; "giv[ing] her unwanted compliments on her body and figure[ and] stating that she was sexy or really attractive[,]" id. ¶ 38; and "ma[king] comments about how [her] clothes showed off her figure, and speculat[ing] about why [she] was dressed up or who she was meeting[,]" id. ¶ 39.  All of these comments were directed to the plaintiff, rather than to others, and at least some of these comments were made in the presence of her male colleagues.  See id.  And the plaintiff alleges that in at least two instances, these comments were accompanied by Sgt. Ford positioning himself between the plaintiff and an exit, "prevent[ing] her from leaving" and thus getting away from Sgt. Ford.  Id. ¶ 56; see id. ¶ 76 (alleging that Sgt. Ford "towered over her" while she was in her bunk alone at night).  Even when Sgt. Ford was not physically impeding the plaintiff's ability to remove herself from interactions with him, she alleges that Sgt. Ford's "body language and demeanor" "intimidated and overwhelmed" her because "it seemed as if [he] was undressing her with his eyes."  Id. ¶ 41.

The plaintiff represents that Sgt. Ford's "repeated objectification and sexualization of her[,]" id. ¶ 40, persisted over the course of years, see id. ¶ 47, "[d]espite [her] numerous oppositions, rejection of advances, and requests to cease[,]" id., and caused the plaintiff to alter her movements at the fire station to avoid Sgt. Ford, and especially to avoid being alone with him, see id. ¶ 96.

The defendant argues that the plaintiff's allegations do not state a claim and must be dismissed because they "are conclusory and lack concrete information about the supposed harassment."  Def.'s Mem. at 18 (citing Bergbauer v. Mabus, 934 F. Supp. 2d 55, 78 (D.D.C.

2013)).  However, the defendant's reliance on <u>Bergbauer</u> as support for this position is misplaced because the Court in <u>Bergbauer</u> determined that the plaintiff had failed to "meet the demanding standard for a hostile work environment claim[]" at the motion for summary judgment stage. <u>See</u> 934 F. Supp. 2d at 91.  While some of the plaintiff's more general allegations are concededly non-specific as to the precise content of the comments or the dates on which they occurred, the Court is mindful that, at this stage of the case, the plaintiff need not plead a prima facie hostile work environment claim in her Complaint, but rather "allege[] facts [that] support such a claim." <u>McKeithan</u>, 803 F. Supp. 2d at 69 (quoting <u>Middlebrooks</u>, 722 F. Supp. 2d at 90–91 & n.6). Further, "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged[,]" <u>Hettinga</u>, 677 F.3d at 476 (internal quotation marks omitted) (quoting <u>Schuler</u>, 617 F.2d at 608).  And, the Amended Complaint clearly indicates that Sgt. Ford's conduct was frequent and repeated, and not limited to just those examples of his actions specifically identified in her Amended Complaint.  Further, Sgt. Ford's repeated objectification of the plaintiff in front of her colleagues would clearly be offensive, degrading, and embarrassing to a reasonable person in the plaintiff's position.  <u>See Oncale</u>, 523 U.S. 75.  Thus, construing the Amended Complaint as it must, the Court concludes that it is reasonable to infer at this stage of the case that Sgt. Ford's conduct was "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment."  <u>Harris</u>, 510 U.S. at 21.

Thus, although, moving forward, the plaintiff's hostile work environment claims "face[] a high hurdle[,]" <u>Fields v. Vilsack</u>, 207 F. Supp. 3d 80, 92 (D.D.C. 2016), the Court concludes that she has "nudged [her] claim[] across the line from conceivable to plausible[,]" <u>Twombly</u>, 550 U.S. at 570; <u>see Moore v. Castro</u>, 192 F. Supp. 3d 18, 47 (D.D.C. 2016), <u>aff'd</u> 775 F. App'x 2

(Mem.) (D.C. Cir. Aug. 9, 2019) ("While the parties' evidence may reveal that the alleged misconduct does not rise to the level of severity or pervasiveness called for by the law . . . , the conduct as stated is sufficiently offensive and frequent to survive a motion to dismiss.").

Similarly, the Court concludes that the plaintiff has adequately stated a claim under the DCHRA.  As the Court has already concluded, the plaintiff alleges that Sgt. Ford's conduct was both frequent and lasted over the course of years, and that Sgt. Ford's comments and actions were sufficiently humiliating or degrading to support her Title VII hostile work environment claim at this stage of the case.  Further, the plaintiff alleges that Sgt. Ford's humiliating and degrading conduct occurred: (1) while he was her supervisor and held at least some authority in relation to her; and (2) both at locations at their place of employment in the presence of other employees and also at least once in the bunkroom of the fire house when the plaintiff was alone. Thus, the Court concludes that the plaintiff has adequately alleged that Sgt. Ford's conduct "unreasonably alters[ed] [her] terms, conditions, or privileges of employment[,]" D.C. Code § (c-2)(2)(A), and, accordingly, it must deny the defendant's motion to dismiss her DCHRA hostile work environment claim.

## C.    Whether the Plaintiff Has Stated a Claim for Retaliation Under Title VII or the DHCRA

The Court next addresses the plaintiff's Title VII and DCHRA retaliation claims based on her position that she was subjected to "an escalating hostile work environment due to her protected activity of both rejecting her supervisor's sexual advances[] and reporting those advances to management[.]"[6]  Pl.'s Opp'n at 28.

---

[6] As indicated above, the plaintiff acknowledges in her opposition to the defendant's motion to dismiss that she "does not allege that [her] involuntary transfer was a stand-alone adverse action[,]" Pl.'s Opp'n at 10, and therefore the Court only addresses the plaintiff's retaliatory hostile work environment claim.

Under Title VII's anti-retaliation provision, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge."  42 U.S.C. § 2000e-3(a).  The anti-retaliation provision seeks to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms[,]" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)), and "protects an individual not from all retaliation, but from retaliation that produce[d] an injury or harm[,]" id. at 67.

To establish a claim for retaliation under Title VII, a plaintiff must "plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by [her] employer, and (3) the two are causally connected."  Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024), cert. denied, 145 S. Ct. 594 (2024) (internal quotation marks omitted) (alteration in original).  A DCHRA retaliation "requires the same showing." Touvian v. District of Columbia, 330 F. Supp. 3d 246, 251 (D.D.C. 2018).

"Unlike discriminatory actions, retaliatory actions need not be employment-related . . . , nor must they result in 'a materially adverse change in the terms or conditions of one's employment.'"  Nurriddin v. Bolden, 40 F. Supp. 3d 104, 116 (D.D.C. 2014), aff'd, 818 F.3d 751 (D.C. Cir. 2016).  "However, actionable retaliation claims are [still] limited to those where an employer causes material adversity, not trivial harms[.]"  Harris v. Mayorkas, No. 21-cv-1083 (GMH), 2022 WL 3452316, at *11 (D.D.C. Aug. 18, 2022) (first alteration in original) (internal quotation marks omitted) (quoting Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007)). And, "retaliatory and substantive hostile work environment claims are governed by the same

standards." <u>Dews v. Howard U. Hospital</u>, No. 24-cv-1490 (DLF), 2025 WL 2377993 (Aug. 15, 2025) (citing <u>Xie v. Chao</u>, No. 21-cv-1289 (DLF), 2022 WL 3585669, at *7 (D.D.C. Aug. 22, 2022)).

Further, to adequately allege a causal link, the "employee's protected activity must be the impetus for the employer's adverse and allegedly retaliatory employment action, and the action cannot have already been contemplated by the employer before it learned of the protected activity." <u>Salak v. Pruitt</u>, 277 F. Supp. 3d 11, 22 (D.D.C. 2017) (internal quotation marks and citation omitted). "In other words, 'retaliation claims must be proved according to traditional principles of but-for causation.'" <u>Toomer v. Carter</u>, No. 11-cv-2216 (EGS/GHM), 2016 WL 9344023, at *22 (D.D.C. Mar. 24, 2016) (quoting <u>Farzam v. Shell</u>, No. 12-cv-35 (RMC), 2015 WL 8664184, at *4 (D.D.C. Dec. 11, 2015)). "However, but-for causation does not mean that retaliation must be the only cause of the employer's action—merely that the adverse action would not have occurred absent the retaliatory motive." <u>Farzam</u>, 2015 WL 8664184, at *4. "[W]hile causation can sometimes be inferred from a close temporal relationship between the protected activity and the allegedly adverse action in retaliation cases, the sequence truly matters[.]" <u>Salak</u>, 277 F. Supp. 3d at 22. And, "[t]he fact that the alleged retaliatory actions precede the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." <u>Lewis v. Columbia</u>, 653 F. Supp. 2d 64, 79 (D.D.C. 2009).

Here, the Court concludes that the plaintiff has adequately established that she engaged in protected activity when she: (1) complained to Capt. Phillips, her second line supervisor, in regards to Sgt. Ford's alleged inappropriate comments to her, <u>see</u> Am. Compl. ¶ 64; (2) contacted the EEO counselor to report Sgt. Ford's conduct on July 31, 2023, <u>see id.</u> ¶ 86; and (3)

submitted her report to the EEO counselor detailing Sgt. Ford's alleged sexual harassment on August 4, 2023, see id. ¶ 99. Because the plaintiff has clearly represented that these informal complaints to her supervisors and/or EEO counselor explicitly concerned Sgt. Ford's alleged sexual harassment, she has adequately established that each of these actions constituted a protected activity. See Dodson v. U.S. Capitol Police, 633 F. Supp. 3d 235, 261 (D.D.C. 2022) (concluding that informal complaints to supervisors that explicitly referenced discrimination constituted protected activity); Barnes v. Hegseth, No. 23-cv-932 (TSC), 2025 WL 915564, at *4 (D.D.C. Mar. 26, 2025) ("The court nonetheless recognizes that informal complaints to supervisors can constitute protected activity when explicitly concerning discrimination.").

However, although the Court has concluded that the plaintiff has adequately established her substantive hostile work environment claim at this early stage of the litigation, the Court finds for several reasons that she has not adequately established a causal link between her protected activity and Sgt. Ford's conduct subsequent to her protected activity. First, although the plaintiff alleges in her Amended Complaint that she was subjected to "a scheme by DCFEMS to take adverse personnel actions against her[,]" Am. Compl. ¶ 178, she has disclaimed reliance on her transfer as a stand-alone adverse action, and even in the context of a retaliatory hostile work environment, she acknowledges that her promotion was "[b]ased on her strong test scores[,]" id. ¶ 119, and that it was this promotion that precipitated her transfer to another unit, see id. ¶ 120. Further, the plaintiff does not allege who in leadership made the decision to promote and then transfer her, which precludes the Court from concluding that the supervisors responsible for making that determination were aware of her protected activity. And, although the plaintiff takes issue with the adequacy of DCFEMS's investigation and corrective actions regarding Sgt. Ford's conduct, see id. ¶ 116, there is no indication that DCFEMS discouraged,

ignored, or otherwise inhibited the pursuit of her protected activity, and she represents that Sgt. Ford was in fact transferred to another unit as a result of that investigation, see id.

Second, in regard to Sgt. Ford's conduct, the Amended Complaint alleges that a hostile work environment existed prior to her protected activity, and the plaintiff only alleges two incidents that occurred after she engaged in her initial protected activity: (1) the comments Sgt. Ford made to her in the bunkroom and (2) Sgt. Ford's lewd comments regarding the plaintiff's classmates. Although these actions may support the plaintiff's substantive hostile work environment claim, they do not indicate that Sgt. Ford escalated or otherwise changed his behavior in response to the plaintiff's complaints to her supervisors or other protected activity, and thus, the Court concludes that she has not adequately established a causal link sufficient to support her retaliatory hostile work environment claim. See Britt v. Wash. Metro. Area Transit Auth., No. 23-cv-844 (JDB), 2024 WL 3509484, at *8 n.10 (D.D.C. July 23, 2024) ("To the extent a hostile work environment already existed before [the plaintiff's] alleged protected activity and did not meaningfully change after this activity, that might undermine a showing of but-for causation." (first citing Erno v. N.Y. State Off. of Info. Tech. Servs., Civ. A. No. 119-1457 (NAM/TWD), 2022 WL 1224325, at *7 (N.D.N.Y. Apr. 26, 2022); then citing Ross v. UChicago Argonne, LLC, Civ. A. No. 18-4200 (JTG), 2020 WL 2041338, at *10 (N.D. Ill. Apr. 28, 2020)).

Accordingly, the Court must dismiss the plaintiff's Title VII and DCHRA claims for retaliation.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes it must grant in part and deny in part the defendant's motion to dismiss.

**SO ORDERED** this 11th day of February, 2026.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.